# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRYSTAL FRUTOZ, *individually and as successors in interest to the Estate of Teresa Hagan*, et al., <br><br> Plaintiffs, <br><br> v. <br><br> VALLEY CHILDREN'S HOSPITAL, et al., <br><br> Defendants. | Case No. 1:25-cv-00016-JLT-SAB <br><br> FINDINGS AND RECOMMENDATIONS RECOMMENDING GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS <br><br> (ECF Nos. 12, 21) <br><br> **OBJECTIONS DUE WITHIN FOURTEEN DAYS** |

Pending before the Court is Defendant Valley Children's Hospital's motion to dismiss. (ECF Nos. 12, 21.) The assigned District Judge referred the motion to the undersigned for the preparation of findings and recommendations. (ECF No. 22.) The motion was fully briefed (ECF Nos. 25, 30), and the Court held a hearing on June 18, 2025. (ECF No. 34.) Counsel Kevin Little, Esq., appeared for Plaintiffs. Counsel Sarah Gosling, Esq., appeared for Defendant Valley Children's Hospital. Having considered the moving papers, as well as the Court's file, the Court issues the following findings and recommendations recommending granting in part and denying in part Defendant's motion to dismiss.

## I.

## BACKGROUND

Plaintiffs are Krystal Frutoz and Richard Hagan, who bring this action individually and as successors in interest to their late daughter, Teresa Hagan ("decedent"), who died on March 18,

1  2024, at the age of nine years old. (ECF No. 4, ¶ 3.) Defendant Valley Children's Hospital (the
2  "Hospital") is a California non-profit corporation with its principal place of business situated in
3  Madera County, California. (Id. at ¶ 4.) At all relevant times, the Hospital granted medical
4  privileges to physicians who qualify as "health care providers," as defined in California's medical
5  malpractice statutes. (Id.), citing Cal. Bus. & Prof Code § 6146(c)(2); Cal. Civ. Code §§
6  3333.1(c)(1), 3333.2(c)(1); Cal. Code of Civ. P. §§ 340.5(1), 364(f)(1), 667.7(e)(3), 1295(g)(1).
7  Additionally, Plaintiffs allege that those employees acted as "apparent agents" of the Hospital with
8  respect to patients who came there seeking care and treatment on an emergency basis. (Id.) The
9  Hospital receives federal funds and is obligated to follow federal law. (Id.) Plaintiffs have also
10 sued Trisha J. Beck, M.D. ("Dr. Beck"), JF Urgent Care, and Janelle A. Fong, M.D. ("Dr. Fong").
11 (Id. at ¶¶ 4-6.) Plaintiffs also allege that Dr. Beck, JF Urgent Care, and Dr. Fong are all "health
12 care providers" within the meaning of the state medical malpractice statutes. (Id.)

13 On January 3, 2024, at approximately 5:57 a.m., decedent presented to the Hospital's
14 Emergency Department with severe symptoms, including a 103-degree fever for more than two
15 days, an elevated heart rate of 122, right periorbital swelling with trace erythema, lethargy, altered
16 mental status, and nausea. (Id. at ¶ 9.) Plaintiffs allege that these symptoms should have triggered
17 a "comprehensive neurological evaluation and imaging studies." (Id.)

18 Indeed, Plaintiffs state that laboratory studies ordered by the Hospital demonstrated critical
19 abnormalities, including "pronounced left shift with 78.2% neutrophils, elevated monocytes at
20 14.0%, and an elevated procalcitonin level of 1.38, [which] all strongly indicat[ed] a severe
21 bacterial infection." (Id. at ¶ 10.) Plaintiffs assert that the Hospital has a standard protocol and
22 historical treatment pattern for pediatric patients presenting with similar laboratory abnormalities.
23 (Id.) Thus, the Hospital's own findings "should have prompted [an] immediate infectious disease
24 consultation and advanced imaging studies to rule out developing abscesses or serious bacterial
25 infection." (Id.)

26 Despite these findings, Plaintiffs allege that the Hospital and Dr. Beck failed to follow the
27 established screening and treatment protocols, which include at a minimum: 1) CT or MRI
28 imaging of the head and orbits; 2) ophthalmology consultation; 3) infectious disease consultation;

1  and 4) consideration of admission for observation and intravenous antibiotics. (Id. at ¶ 11.)
2  Plaintiffs allege that the Hospital's "historical treatment records and protocols demonstrate[d] that
3  similarly situated pediatric patients presenting to the emergency department with comparable
4  symptoms routinely receive[d] head imaging, specialty consultation, and admission for
5  observation." (Id. at ¶ 12.) Thus, Plaintiffs state that the Hospital's efforts concerning decedent
6  represented a departure from the Hospital's standard practices. (Id.) Moreover, the Hospital
7  "failed to utilize readily available ancillary services that their polices require for proper screening
8  of pediatric patients . . ., including [1] the Hospital's CT scanner . . .; [2] the Hospital's on-call
9  pediatric ophthalmologist; [3] the Hospital's on-call pediatric infectious disease specialist; [4] the
10 Hospital's pediatric neurology service; [5] the Hospital's pediatric admission services; and [6] the
11 Hospital's pediatric intensive care unit." (Id. at ¶ 13.) Decedent did not receive any of these
12 screening measures and was discharged after approximately seven hours with prescriptions for oral
13 clindamycin and ondansetron. (Id. at ¶ 11.) Decedent was also given instructions to follow up
14 with an eye doctor. (Id.)

15 On multiple occasions in mid-January 2024, decedent was seen by Dr. Fong at JF Urgent
16 Care. (Id. at ¶ 14.) Decedent presented with "continuing symptoms of severe headache and other
17 neurological symptoms." (Id.) Dr. Fong diagnosed decedent with ear infections and prescribed
18 oral antibiotics without investigating the underlying cause or obtaining "appropriate imaging
19 studies." (Id.)

20 By February 7, 2024, decedent's condition had critically deteriorated. (Id. at ¶ 15.)
21 Decedent had developed visual disturbances and left-sided weakness, and decedent was unable to
22 control bodily functions. (Id.) Decedent presented again to the Hospital where emergency CT
23 imaging revealed a massive brain abscess "the size of an orange" with additional abscesses
24 present. (Id.) Despite multiple emergency neurological interventions including craniotomies,
25 decedent developed severe complications, including diabetes insipidus and extensive brain
26 damage. (Id. at ¶ 16.) Following nearly six weeks of intensive care, on March 18, 2024, at 5:28
27 p.m., decedent expired following compassionate extubation. (Id.)

28 Plaintiffs allege that the decedent's death would have been preventable "had she received

appropriate screening, diagnosis, and treatment when she initially presented to [the Hospital] on January 3, 2024, or during her subsequent visits to Dr. Fong." (Id. at ¶ 17.) Subsequently, culture results demonstrated that decedent had a Bacteroides infection, which "could have been successfully treated if properly diagnosed and managed at an earlier stage." (Id.) Plaintiffs assert that this exact type of bacterial infection is what the Hospital's standard screening protocols for pediatric patients with fever and altered mental status is designed to identify and treat. (Id.)

On January 3, 2025, Plaintiffs commenced this action (ECF No. 1), and on March 14, 2025, Plaintiffs filed an amended complaint, bringing the following causes of action: 1) a violation of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd; 2) a violation of the California Health & Safety Code § 1317; 3) medical negligence under California law; and 4) wrongful death, Cal. Code Civ. P. § 377.60. (ECF No. 4.) Plaintiffs pray for general, special, punitive,[1] and exemplary damages; Plaintiffs also seek reasonable funeral and burial costs, prejudgment interest, and costs of brining this lawsuit. (Id. at p. 12.) On April 3, 2025, Defendant Hospital filed the instant motion to dismiss, which the assigned district judge referred to the undersigned for the preparation of findings and recommendations. (ECF Nos. 12, 21, 22.) The motion has been fully briefed (ECF Nos. 25, 30), and on June 18, 2025, the Court held a hearing and heard argument from the relevant parties. (ECF No. 34.)

## II.

## LEGAL STANDARDS

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim

---

[1] Following a meet and confer required by the District Judge (ECF No. 19), the parties "agree[d that] punitive damages are not warranted in this case." (ECF No. 21.) Thus, Plaintiffs do "not oppose Valley Children's Hospital's request to dismiss . . . the prayer for punitive damages." (Id.) Accordingly, the Court will recommend that Plaintiffs' prayer for punitive damages be dismissed with prejudice.

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Plausibility requires pleading facts, as opposed to conclusory allegations or the formulaic recitation of the elements of a cause of action, and must rise above the mere conceivability or possibility of unlawful conduct that entitles the pleader to relief." Somers v. Apple, Inc., 729 F.3d 953, 959-60 (9th Cir. 2013) (cleaned up). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

In ruling on a Rule 12(b)(6) motion, the court "accept[s] all factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." Rowe v. Educ. Credit Mgmt. Corp., 559 F.3d 1028, 1029-30 (9th Cir. 2009) (citation omitted). But "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences" need not be accepted. In re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted). "Dismissal is appropriate when the complaint lacks a cognizable legal theory or sufficient factual allegations to support a cognizable legal theory." Saloojas, Inc. v. Aetna Health of Cal., Inc., 80 F.4th 1011, 1014 (9th Cir. 2023) (cleaned up).

### III.

### DISCUSSION AND ANALYSIS

The Hospital begins by arguing that Plaintiffs have failed to state a claim for their sole federal cause of action, a violation of EMTALA. (ECF No. 12, pp. 6-8.) Should the Court agree, the Hospital requests that the remaining causes of action be dismissed for want of subject-matter jurisdiction. (Id. at pp. 8.) If the Court were to find that Plaintiffs stated a claim under EMTALA, the Hospital argues that the Court should dismiss Plaintiffs' second cause of action because the relevant statute "does not appear to describe a private cause of action." (Id. at p. 9.) Plaintiffs oppose, arguing that they state a claim under EMTALA per current Ninth Circuit authority. (ECF No. 25, pp. 7-17.) Plaintiffs also argue that they state a claim under California Health and Safety Code § 1317. (Id. at pp. 17-18.) Finally, Plaintiffs argue that should the Court dismiss their EMTALA claim, the Court may nonetheless exercise its pendent jurisdiction over the remaining state-law claims. (Id. at p. 19.) The Court agrees with Plaintiffs that they have stated a claim

under EMTALA and § 1317.

**A.  EMTALA Statutory Background**

As relevant here, EMTALA, 42 U.S.C. § 1395dd, provides that hospitals with emergency departments are required to provide appropriate medical screening examinations and, if required, necessary stabilizing treatment. Regarding the medical screening requirements, EMTALA provides:

> In the case of a hospital that has a hospital emergency department, if any individual . . . comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition . . . exists.

42 U.S.C. § 1395dd(a). In turn, an "emergency medical condition" is defined as:

> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—(i) placing the health of the individual . . . in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part . . . .

Id. at § 1395dd(e)(1).

Regarding necessary stabilization, EMTALA provides:

> If any individual . . . comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or (B) for transfer of the individual to another medical facility in accordance with subsection (c).

Id. at § 1395dd(b)(1). Under the statute, "to stabilize" and "stabilized" are defined as follows:

> The term "to stabilize" means, with respect to an emergency medical condition described in paragraph [(e)](1)(A), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility . . .
>
> The term "stabilized" means, with respect to an emergency medical condition described in paragraph [(e)](1)(A), that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of

6

the individual from a facility . . . .

Id. at § 1395dd(e)(3)(A), (B).

In addition, EMTALA provides a private right of action:

> Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

Id. at § 1396dd(d)(2)(A).

### B.   Whether Plaintiffs State a Claim Under EMTALA

The Hospital argues that a subsection (a) claim (adequate medical screening) of EMTALA requires allegations of an improper motive on the part of the Hospital, which Plaintiffs did not allege. (ECF No. 12, p. 7.) The Hospital also argues that because Plaintiffs have failed to allege an emergency medical condition, the Hospital was under no duty to stabilize decedent. (Id.) In further support of its position, the Hospital notes that decedent sought further care and "did not pass away until nearly 2.5 months after the January 2024 presentation to the [Hospital's] emergency department." (Id. at p. 8.) In opposition, Plaintiffs argue that improper motive is not required under EMTALA and that the Ninth Circuit's has established a standard, which Plaintiffs meet, for evaluating EMTALA cases involving claims of adequate medical screening and stabilization. (ECF No. 25, pp. 8-9.) In its reply, the Hospital clarifies that, in its view, improper motive is "one way in which a plaintiff may establish an EMTALA claim." (ECF No. 30, p. 2.) The Court agrees with Plaintiffs.

#### 1.   Adequate Medical Screening

As discussed by the Ninth Circuit, "EMTALA imposes two duties on hospital emergency rooms: a duty to screen a patient for an emergency medical condition, and, once an emergency condition is found, a duty to stabilize the patient before transferring or discharging him." Baker v. Adventist Health, Inc., 260 F.3d 987, 992 (9th Cir. 2001).

Regarding screening, "[t]he statutory language of the EMTALA clearly declines to impose on hospitals a national standard of care in screening patients." Jackson v. East Bay Hosp., 246

7

1  F.3d 1248, 1255 (9th Cir. 2001), quoting Eberhardt v. City of Los Angeles, 62 F.3d 1253, 1258
2  (9th Cir. 1995). Instead, the "touchstone is whether, as § 1395dd dictates, the procedure is
3  designed to identify an 'emergency medical condition,' that is manifested by 'acute' and 'severe'
4  symptoms." Id., quoting Eberhardt, 62 F.3d at 1258. In order to comply with this requirement, "a
5  hospital only must provide a screening examination that is comparable to that offered to other
6  patients with similar symptoms." Id. In other words, "a hospital satisfies EMTALA's 'appropriate
7  medical screening' requirement if it provides a patient with an examination comparable to the one
8  offered to other patients presenting similar symptoms." Id. at 1256, quoting Eberhardt, 62 F.3d at
9  1257. That said, "hospitals [are not] required under EMTALA to provide screenings that are
10 beyond their capabilities." Baker, 260 F.3d at 995. In addition, a hospital can violate EMTALA's
11 appropriate medical screening requirement if "the examination is so cursory that it is not 'designed
12 to identify acute and severe symptoms that alert the physician of the need for immediate medical
13 attention to prevent serious bodily injury.'" Id. at 1256, quoting Eberhardt, 62 F.3d at 1257.

14         Preliminarily, the Court agrees with the Hospital (and Plaintiffs) that the Supreme Court of
15 the United States has unequivocally determined that an "improper motive" is not required to
16 establish a subsection (b) claim (stabilization) under EMTALA. Roberts v. Galen of Virginia, Inc.,
17 525 U.S. 249 (1999). However, the Court finds the Hospital's argument that an improper motive
18 is required, or can even form a basis, for subsection (a) claims (adequate medical screenings) to be
19 unmoored from Ninth Circuit precedent, the statute, and ultimately unsupported. Cf. A. J. T. v.
20 Osseo Area Schools, Independent School District No. 279, 605 U.S. ___, ___ S. Ct. ___, 2025 WL
21 1657415, at *6 (2025) (rejecting a judicially created heightened standard where "no textual
22 indication" nor "remedial provision" suggested such a statutory interpretation).

23         Indeed, the Hospital's only precedent—from the Sixth Circuit—expressly declined to "go
24 into the question of what constitutes inadequate screening procedures in [subsection (a)]'s terms."
25 Cleland v. Bronson Health Care Group, Inc., 917 F.2d 266, 272 (6th Cir. 1990). To be sure, the
26 Cleland Court discussed that the statutory term "'appropriate' must more correctly be interpreted
27 to refer to the motives with which the hospital acts." Id. But the Court continued in the next
28 sentence, "[i]f [the hospital] acts in the same matter as it would have for the usual paying patient,

then the screening provided is 'appropriate' within the meaning of the statute." Id. Thus, in reality, Cleland appears to be in accord with at least the Ninth Circuit's comparative approach to evaluating subsection (a) claims. Therefore, the Court declines to review Plaintiffs' claims with the Hospital's suggestion that improper motive is required or can even form a basis of a subsection (a) claim under EMTALA. The Court will apply prevailing Ninth Circuit precedent.

The Hospital walks back its reliance on Cleland in its reply, instead glossing over its previous assertion and arguing that, in any event, Plaintiffs are required to (and failed to) allege "facts establishing both that [the Hospital] determined the decedent had an emergency medical condition *and* that it failed to provide sufficient examination and/or treatment to stabilize the decedent before discharge." (ECF No. 30, p. 2) (emphasis in original). However, this is not what Baker, Jackson, Eberhardt, or the statute require. The Hospital puts the cart before the horse because the adequate medical screening is for the very purpose to determine whether an emergency medical condition exists. Only if an emergency medical condition exists, and a hospital detects it, then does the stabilization requirement trigger. Thus, the adequate medical screening is evaluated in and of itself.

As stated above, "a hospital satisfies EMTALA's 'appropriate medical screening' requirement if it provides a patient with an examination comparable to the one offered to other patients presenting similar symptoms." Jackson, 246 F.3d at 1256. It stands to reason that in order to allege a violation of subsection (a) under EMTALA, a plaintiff needs to allege that the hospital did not provide a patient with an examination comparable to examinations given to other patients presenting with similar symptoms. The Court finds that the Plaintiffs have done so here. Plaintiffs have alleged that decedent presented to the Hospital with severe symptoms, including a 103-degree fever for more than two days, an elevated heart rate of 122, right periorbital swelling with trace erythema, lethargy, altered mental status, and nausea. Plaintiffs also alleged that laboratory studies demonstrated critical abnormalities, which all strongly indicated a severe bacterial infection. Significantly, Plaintiffs alleged that the Hospital's historical treatment records and protocols demonstrate that "similarly situated pediatric patients presenting to the emergency department with comparable symptoms routinely receive[d] head imaging, specialty consultation, and admission for

1  observation." (ECF No. 4, ¶¶ 12, 20(a).) Plaintiffs then offered lengthy examples of minimum
2  treatment protocols and ancillary services that were not offered to decedent. (Id. at ¶¶ 11, 13.)
3  Taking the facts in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have
4  plausibly alleged that decedent presented to the Hospital with severe symptoms and that the
5  Hospital did not conduct a screening that was comparable to similarly situated pediatric patients
6  presenting with comparable symptoms.

7  By the same token, the Court finds that Plaintiffs have also alleged that the Hospital's
8  examination was so cursory that it was not designed to identify acute and severe symptoms that
9  would have alerted a physician of the need for immediate medical attention to prevent serious
10 bodily treatment. Again, Plaintiffs alleged that the Hospital performed some laboratory tests that
11 demonstrated, in Plaintiff's' view, critical abnormalities that were objectively abnormal. Because
12 the Hospital did not follow up on these results, Plaintiffs have also alleged that what testing was
13 conducted on decedent was cursory.

14 Therefore, the Court will recommend denying the Hospital's motion to dismiss as to
15 Plaintiffs' adequate medical screening claim under EMTALA.

**2.  Necessary Stabilizing Treatment**

17 Regarding stabilization, a "hospital's duty to stabilize the patient does not arise until the
18 hospital first detects an emergency medical condition." Jackson, 246 F.3d at 1257, quoting
19 Eberhardt, 62 F.3d at 1259. Known as the "'actual detection' rule, . . . this requires a showing of
20 actual knowledge of the emergency medical condition by the hospital as a condition precedent to
21 the stabilization requirement." Id., citing Summers v. Baptist Medical Center Arkadelphia, 91
22 F.3d 1132, 1140 (8th Cir. 1996). Thereafter, "the hospital must provide either—(A) within the
23 staff and facilities available at the hospital, for such further medical examination and such
24 treatment as may be required to stabilize the medical condition, or (B) for transfer of the individual
25 to another medical facility in accordance with subsection (c)." 42 U.S.C. § 1395dd(b)(1)

26 The Court begins by finding that Plaintiffs have alleged that decedent presented to the
27 Hospital with a "emergency medical condition." 42 U.S.C. § 1395dd(e)(1)(A). Once more, taking
28 all facts in the light most favorable to Plaintiffs, the Court finds that the symptoms decedent

presented to the Hospital with, along with the laboratory results, plausibly demonstrate that without immediate medical attention, it could reasonably be expected that decedent's health would be placed in serious jeopardy, serious impairment to bodily functions would result, or serious dysfunction of any bodily organ or part would result. See id.

At the hearing, Plaintiffs clarified that their stabilization claim under EMTALA is pleaded as an alternative theory. In other words, following discovery, it will become apparent whether the Hospital had actual knowledge of decedent's emergency medical condition, which then may be tested in summary judgment. As presently pleaded, the Court can make a plausible inference that the Hospital, or its agents, actually detected or knew of the alleged emergency medical condition and did not stabilize decedent as statutorily defined. In addition, Plaintiffs have alleged that decedent did not receive "such treatment as may be required to stabilize the medical condition." 42 U.S.C. § 1395dd(b)(1). With this understanding, the Court finds that Plaintiffs have sufficiently alleged a stabilization claim under EMTALA. See Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011) ("[T]he factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation."). To be sure, actual detection or knowledge will ultimately be required for such a claim. Eberhardt, 62 F.3d at 1259.

The Court finds the remainder of the parties' discussions on EMTALA generally to be largely unhelpful on whether Plaintiffs have stated a claim for which relief can be granted. In particular, the parties discuss the issue at times as if this were a motion for summary judgment with evidentiary and credibility determinations required of the Court. (See ECF No. 25, pp. 12-16; ECF No. 30, pp. 2-5.) For example, Plaintiffs discuss that *evidence* of a hospital's failure to follow its own protocols can support an EMTALA claim and then go into cases discussing Hoffman v. Tonnemacher, 425 F. Supp. 2d 1120 (E.D. Cal. 2006), a relevant case but on a motion for summary judgment posture. Meanwhile, the Hospital attacks Plaintiffs' allegations that the Hospital should have done more to evaluate decedent's condition. One other example the Court will address is the Hospital's request that the Court infer that because decedent was discharged and lived for nearly 2.5 months, the Court can find that this "evidenced" that decedent was "stabilized"

when she left the Hospital's emergency department in January 2024. (ECF No. 30, p. 4.) This type of inference is not permissible on a motion to dismiss.

Moreover, none of the caselaw proffered by the parties is on a posture of a motion to dismiss for failure to state a claim. Jackson, 246 F.3d 1248 (affirming summary judgment and declination of retaining state law claims); Baker, 260 F.3d 987 (affirming summary judgment); Bryant, 289 F.3d 1162 (affirming summary judgment); Eberhardt, 62 F.3d 1253 (affirming summary judgment); Battle ex rel. Battle v. Memorial Hosp. at Gulfport, 228 F.3d 544 (5th Cir. 2000) (affirming in part, vacating in part, and remanding following a determination of judgment as a matter of law and a jury verdict); Correa v. Hospital San Francisco, 69 F.3d 1184 (1st Cir. 1995) (affirming jury verdict); Romar ex rel. Romar v. Fresno Community Hosp. and Medical Center, 583 F. Supp. 2d 1179 (E.D. Cal. 2008) (application to determine whether California Medical Injury Compensation Reform Act applied to the plaintiff's EMTALA claim); Hoffman, 425 F. Supp. 2d 1120 (summary judgment). Of course, on a motion to dismiss, the Court takes all allegations in the operative complaint as true and construes them in the light most favorable to the nonmovant, which here is Plaintiffs. Thus, while this caselaw is informative, it provides little guidance on whether Plaintiffs have sufficiently pleaded a cause of action under EMTALA.

The Court will recommend denying the Hospital's motion to dismiss as to Plaintiffs' EMTALA stabilization claim.

### 3. Plaintiffs State a Claim Under California Health & Safety Code § 1317

The Hospital argues that California Health & Safety Code § 1317 does not include language that explicitly provides for a private right of action, in contrast to EMTALA.[2] (ECF No. 12, p. 9.) The Hospital then pivots, stating that a number of federal district courts have considered § 1317 and relied on the Ninth Circuit case Eberhardt. (Id.) Thus, based on its arguments under EMTALA, the Hospital argues that the Court should dismiss Plaintiffs' § 1317 claim for failure to state a claim. (Id.) Plaintiffs oppose, stating that "[t]he case law provided clearly establishes that Section 1317 provides a basis for a private cause of action." (ECF No. 25, p. 17.) Plaintiffs then

---

[2] The Court observes that Cal. Health & Safety Code § 1317.6(j) does provide a private right of action for individuals who "suffer personal harm" from a "transferring or receiving hospital." Here, Plaintiffs do not allege that decedent was transferred or received by a hospital.

12

1  explain how they have sufficiently stated a claim and that a § 1317 claim may overlap with state
2  malpractice actions. (Id. at p. 18.) The Court agrees with Plaintiffs.

3        The Court first addresses the Hospital's suggestion that § 1317 might not provide a private
4  right of action, which the Court notes is a serious assertion. The California Supreme Court has not
5  spoken on the issue nor is there definitive published guidance from the California Court of Appeal.
6  Yet, this argument was underdeveloped by the parties. The Hospital dedicates one sentence to the
7  issue, and Plaintiffs gave three. Neither party even goes into a discussion of California caselaw at
8  any jurisdictional level on § 1317 or how this Court would even begin to evaluate whether § 1317
9  provides a private right of action. See, e.g., San Diegans for Open Government v. Public
10 Facilities, Financing Authority of the City of San Diego, 8 Cal. 5th 733, 739, 455 P.3d 311 (Cal.
11 2019) (discussing the analysis California courts undertake when evaluating whether a state statute
12 provides a private right of action).

13       The Court does not appreciate "drop in" arguments and will not conduct an independent
14 analysis of whether § 1317 provides a private right of action. In any event, the Hospital does not
15 disagree that many federal district courts have reviewed, analyzed, and allowed § 1317 claims to
16 proceed (ECF No. 12, p. 9), which implies there would be a private right of action. Additionally,
17 the Court notes that, on its own review, several state superior courts have allowed § 1317 claims to
18 proceed where a private individual brings such a claim. See, e.g., Daniels v. Vivas, 2024 Cal.
19 Super. LEXIS 41396 (Cal. Super. Ct. Oct. 25, 2024); Rubyan v. Physician Surgery Ctr. at Glendale
20 Adventist, 2021 Cal. Super. LEXIS 92267 (Cal. Super. Ct. Apr. 30, 2021); Goshko v. Mills-
21 Peninsula Health Servs., 2012 Cal. Super. LEXIS 15191 (Cal. Super. Ct. Dec. 13, 2012). Finally,
22 at the hearing, the Hospital gave no response, beyond relying on its briefing, to the Court's
23 questioning on the issue. Given the foregoing, the Court declines to entertain the Hospital's
24 suggestion and moves on to the merits.[3]

---

[3] The only case offered from the parties on this issue was from Plaintiffs. However, in Jackson, the issue of whether § 1317 provides a private right of action was not squarely before the Ninth Circuit. Instead, the Jackson Court concluded, following other statutory analysis, that the district court had not erred in granting summary judgment to the defendant hospital. 246 F.3d at 1258-60. For this reason, Plaintiffs reliance on the Jackson Court observing that "California Health and Safety Code § 1317 is 'California's version of 42 U.S.C. § 1395dd'" is unpersuasive insofar as being dispositive on this issue. Id. at 1258, quoting Brooker v. Desert Hospital Corp., 947 F.2d 412, 415 (9th Cir. 1991). Indeed, Jackson was quoting Brooker, another Ninth Circuit case where the issue of whether a § 1317 a

Similar to EMTALA, § 1317 imposes on California hospitals an obligation to tend to all patients requesting emergency care:

> Emergency services and care shall be provided to any person requesting the services or care, or for whom services or care is requested, for any condition in which the person is in danger of loss of life, or serious injury or illness, at any health facility licensed under this chapter that maintains and operates an emergency department to provide emergency services to the public when the facility has appropriate facilities and qualified personnel available to provide the services or care.

Jackson, 246 F.3d at 1258, quoting Cal. Health & Safety Code § 1317(a). The statute defines "emergency services and care" as "medical screening, examination, and evaluation by a physician . . . to determine if an emergency medical condition or active labor exists and, if it does, the care, treatment, and surgery by a physician necessary to relieve or eliminate the emergency medical condition, within the capability of the facility." Cal. Health & Safety Code § 1317.1(a)(1).

Section 1317 also provides a safe harbor for hospitals and doctors who refuse to render care, provided that their refusal is based on a determination that the person is not suffering from an emergency condition or that they cannot treat the emergency condition afflicting the patient:

> Neither the health facility, its employees, nor any physician and surgeon . . . shall be liable in any action arising out of a refusal to render emergency services or care if the refusal is based on the determination, exercising reasonable care, that the person is not suffering from an emergency condition, or that the health facility does not have the appropriate facilities or qualified personnel available to render those services.

Cal. Health & Safety Code § 1317(c).

Expounding on § 1317, the Ninth Circuit has held that "§ 1317(c)'s duty of reasonable care only applies in two situations." Jackson, 246 F.3d at 1259. "First, it applies when the hospital does not provide a medical screening, examination, or evaluation to determine if the patient presents an emergency medical condition." Id. The Court explained that "[s]uch a failure constitutes 'a refusal to render emergency services and care.'" Id., citing Cal. Health & Safety Code §§ 1317(c), 1317.1(a)(1). "Second, § 1317(c)'s duty of reasonable care applies when a

---

private right of action lies was not before the Court. Rather, the Brooker Court was merely providing context when it stated that § 1317 is "California's version of [EMTALA,] 42 U.S.C. § 1395dd." 947 F.2d at 415.

14

doctor diagnoses a condition, but declines to provide treatment because he determines either that the condition is not an 'emergency medical condition' or that the hospital does not have the appropriate facilities or personnel to provide care." Id. at 1259-60.

Given the facts in this case, the Court agrees with Plaintiffs that the amended complaint plausibly alleges that the Hospital failed to exercise reasonable care in providing a medical screening of decedent. The Court also agrees that Plaintiffs have alleged that the Hospital diagnosed decedent, but it was determined not to be an emergency medical condition. Thus, decedent was not provided other subsequent treatment. Therefore, Court finds that Plaintiffs have stated a claim. Accordingly, the Court will recommend denying the Hospital's motion to dismiss at to Plaintiffs' claim under California Health & Safety Code § 1317.

### 4. Subject-Matter and Supplemental Jurisdiction

The Court has determined that Plaintiffs' have stated a claim under EMTALA, and therefore, federal question jurisdiction lies. 28 U.S.C. § 1331. Therefore, the Hospital's consequent challenge under Rule 12(b)(1), dismissal for lack of subject-matter jurisdiction, is moot. Moreover, the Court concludes that the District Court also has supplemental jurisdiction over Plaintiffs' related claims. 28 U.S.C. § 1367(a). The Court will recommend denying the Hospital's motion to dismiss as to the District Court lacking subject-matter jurisdiction and/or declining supplemental jurisdiction over Plaintiffs' state law claims.

## V.

## CONCLUSION AND RECOMMENDATION

Based on the foregoing, IT IS HEREBY RECOMMENDED that Defendant Valley Children's Hospital's motion to dismiss (ECF Nos. 12, 21) be GRANTED IN PART and DENIED IN PART as follows:

1. Granting the motion to dismiss as to Plaintiffs' prayer for punitive damages, with prejudice;
2. Denying the motion to dismiss as to Plaintiffs' EMTALA claim;
3. Denying the motion to dismiss as to Plaintiffs' California Health & Safety Code § 1317 claim; and

15

4. Denying the motion to dismiss as to the Court lacking subject-matter jurisdiction and/or declining to exercise supplemental jurisdiction over Plaintiffs' state law claims.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304. Within **fourteen (14) days** of service of this recommendation, any party may file written objections to these findings and recommendations with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014), citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **June 26, 2025**

STANLEY A. BOONE
United States Magistrate Judge